**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF GEORGIA**
**ALBANY DIVISION**

KEITH BECKHAM., :
:
Plaintiffs, :
:
vs. : 1:04-CV-123 (WLS)
:
EARLY BANKSHARES, INC., d/b/a :
BANK OF EARLY; DAWSON COUNTRY :
CLUB, INC., "BUTCH" WIGGINS and :
MIKE MONTGOMERY, :
:
Defendants. :
___________________________________

**ORDER**

Pending before the Court are the parties' cross motions for summary judgment. (Docs. 26, 27, 29). For the following reasons, Defendants Early Bankshares, Inc.'s (hereinafter "Georgia Bank of Dawson" or "GDB") and "Butch Wiggins' motion for summary judgment (Doc. 26) is **GRANTED;** Defendants Dawson Country Club, Inc.'s (hereinafter "Dawson Country Club" or "Country Club") and Mike Montgomery's motion for summary judgment (Doc. 27) is **GRANTED**; and Plaintiff's motion for partial summary judgment (Doc. 29) is **DENIED.**

**BACKGROUND**

Dawson, Georgia is a small town in Terrell County. It has a population of approximately 5,000 people. Dawson has three banks, the Bank of Dawson, the Bank of Terrell and Defendant Georgia Bank of Dawson. F.C. "Butch" Wiggins is the President and CEO of the Bank of Early. The Bank of Early began the Georgia Bank of Dawson after it acquired Sun Trust's Dawson branch in 1996. Wiggins hired Plaintiff Keith Beckham to manage GBD on August 14, 2002. According to Wiggins and GDB, Beckham's resume overstated his qualifications and experience. This overstatement was discovered after Beckham was terminated.

Beckham's job duties were to manage the bank and expand its business. As a result of those duties Beckham was required to cultivate relationships with members of Dawson's business

and community leaders. GDB formed a bank "Advisory Board" shortly after Beckham was hired. The Advisory Board was comprised of local business people and assisted Beckham in developing business relationships with local business leaders. The Bank agreed to pay Beckham's membership in the local country club, Dawson Country Club. The Bank did not require Beckham or any of its employees to join the Country Club. Beckham's successor, Lewis Banks, does not belong to the Club.

Dawson Country Club is a private club with approximately 140 members. The membership consists of many local business leaders, including several members of GBD's Advisory Board. The Club has an open membership policy and does not have a policy of excluding African-Americans. To join the Club one must apply and obtain the approval of the Board of Directors and pay annual dues of $600.

Two African-Americans, Frank Wilson and June Richey, have joined the Club in the past few years. Marty Carrington, one of Beckham's predecessors at GBD sponsored Wilson's application for membership at the Club. No African-American has applied and been denied membership at the Club.

Defendant Mike Montgomery became the general manager of the Club in 2003. Shortly after being hired, Montgomery sent a letter to the Club's members introducing himself and asking for suggestions on how to improve the Club. The only person to respond to Montgomery's letter was Beckham. Beckham sent his letter to Mongomery on October 1, 2003. Beckham's letter provides in full:

> "Dear Mr. Montgomery:
>
> We received your letter requesting updated mailing information. In your letter you welcomed suggestions for the future of the club. I am pleased that someone is now taking the helm and welcoming suggestions. Up until now, there have been too many chiefs and not enough Indians at the club. My suggestions are as follows:
>
> 1. Not everyone wants to eat in a smoke-filled room. We attended 2 Friday night

dinners and came home smelling like ashtrays. If the good ole boys want to smoke, make them smoke outside or enclose a smoking area around the bar. Until that is done, you will never have the attendance you desire and membership won't grow.

2. Remove the bucket at the front door that is filled with empty beer cans and cigarette butts. That is the first thing you see when you walk up to the front door. Purchase a cigarette chimney and proper waste containments [sic].
3. The men's restroom should be as nice as the women's restroom—enough said.
4. Offer activities for the family that we can actually bring our kids to.
5. Have someone take care of the tennis court properly. We would play tennis if the court were in good shape. That is a way to get the young folks and their children interested in the club.
6. The pool hasn't had the proper maintenance it needs in 20 years. My wife brought our children to the pool this summer and was horrified that nobody kept check of the chlorine ph level. Has anyone heard of e.coli? One bad case of it as a result of pool negligence and you can kiss the club goodbye. Keep the pool clean and don't drain it off each fall. I spoke with a professional pool cleaner and was told it is much cheaper to keep a pool maintained year-round than to start over each spring.
7. Put prejudice aside and open the membership to the African Americans. If they can afford to pay the dues, let them take part. Terrell County is around 70% black and I'm sure you can get members from the populace that can appreciate a nice club. We are in the 21 st century and should act like it.
8. You need new board members. The present board has been there too long. Get some new, fresh young minds in there or nothing will change.

Those are just some ideas for you to ponder. Perception is powerful. When I first got here, I was told that the club was a private place for the old guard to go

and drink. Others weren't felt [sic] welcomed. That perception soon became reality. That perception needs to be changed. It is not out of the way to drive to Albany or Lee County to enjoy a nice game of golf.

I am an optimist by nature, but in this case I personally don't feel that the club will survive. I wish that it would survive, but the odds are against it. The County Commission doesn't want growth in Terrell County. Families that own the majority of the land run Terrell County and racism is still very much present.

Good luck!!"

When Beckham wrote the letter he had been living in Dawson for about fourteen months and had been a member of the Club for about twelve months. He had used the Club about once or twice a month since he had joined. Beckham asserts that he had spoken with members of the Advisory Board and some Club members about the Club's admission policy. None of the members of the Advisory Board or the Club acknowledge such a conversation took place. Beckham admits that no one ever told him that the Club had a policy against African-American's joining the Club or that any African-American who applied had ever been denied membership.

Beckham testified that he believes that African-American were not welcome at the Club. Beckham also testified that he heard a female member of the Club say, "We can't let this club close because we had the pool built so we wouldn't let the blacks swim in it." The member denies making the statement. Beckham has produced an affidavit from Frank Wilson, apparently the first African-American member of the Club. In the affidavit Wilson states that while a member he never believed he was welcome at the Club because of his race.

On October 23, 2003, Bill Whitaker, a Club member and customer of GDB, gave a copy of the letter to GBD Advisory Board member Jim Melvin. When Melvin read the letter, he decided to call Wiggins and inform him of the letter and discussions he had overheard. Melvin read the letter to Wiggins and faxed him a copy. Upon hearing the letter, Wiggins decided to require Beckham's immediate resignation. Wiggins believed that the letter threatened to

damage the Bank because of the offensive comments and derogatory comments about the same people the Bank was trying to cultivate as customers. Wiggins did not discuss his decision to require Beckham to resign with any members of the Advisory Board or the Dawson Country Club.

On October 23, 2003, Wiggins called Beckham to confirm whether Beckham had written the letter. Wiggins tape recorded his conversation with Beckham and a transcript of the conversation is part of the record. Beckham confirmed that he wrote the letter and Wiggins asked for his resignation. Beckham at first agreed to consider resigning, but after talking to a lawyer changed his mind. Wiggins terminated Beckham's employment on October 24, 2003.

Beckham admits that he never complained to anyone at the Bank of perceived discrimination at the Club, except during his conversation with Wiggins on October 23, 2003. Further, Beckham is unaware of any African-American who was denied membership in the Club.

As a result of his termination, Beckham filed the instant lawsuit against GBD, Wiggins, the Dawson Country Club and Montgomery. Plaintiff filed a seven count complaint, which in reality is five actual counts. The complaint is misnumbered; there is not a Count II or V. Count I is a Title VII claim for retaliation against GDB. Count III is a 42 U.S.C. § 1981 claim against GDB, Wiggins, Dawson Country Club and Montfomery for retaliation. Count IV is a 42 U.S.C. § 1985 retaliation claim against GDB, Wiggins, Dawson Country Club and Montgomery. Count VI is a state law claim for tortious interference with contractual relations against Dawson Country Club and Montgomery. Count VII is a state law claim for tortious interference with business relationship against Dawson Country Club and Montgomery.

## SUMMARY JUDGMENT STANDARD

Under Rule 56(c) of the Federal Rules of Civil Procedure, summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." The Court is required to "resolve

all reasonable doubts about the facts in favor of the non-movant, and draw all justifiable inferences in his or her favor." Fitzpatrick v. City of Atlanta, 2 F.3d 1112, 1115 (11th Cir. 1993) (quotations and citations omitted).

The moving party carries the initial burden of showing that there is an absence of a genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323, 106 S. Ct. 2548, 2553 (1986). The substantive law governing the case determines which facts are material, and "summary judgment will not lie if the dispute about a material fact is 'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S. Ct. 2505, 2510 (1986). For issues on which the non-movant bears the burden of proof at trial, the moving party "simply may show—that is, point out to the district court—that there is an absence of evidence to support the non-moving party's case. Alternatively, the moving party may support its motion for summary judgment with affirmative evidence demonstrating that the non-moving party will be unable to prove its case." Fitzpatrick, 2 F.3d at 1116 (quotations and citations omitted).

If the moving party fails to overcome this initial burden, the Court must deny the motion for summary judgment without considering any evidence, if any, presented by the non-moving party. Fitzpatrick, 2 F.3d at 1116. If, on the other hand, the moving party overcomes this initial burden, then the non-moving party must show the existence of a genuine issue of material fact that remains to be resolved at trial. Id. Moreover, the adverse party may not respond to the motion for summary judgment by summarily denying the allegations set forth by the moving party. Rather, the adverse party "must set forth specific facts showing that there is a genuine issue for trial. If the adverse party does not so respond, summary judgment, if appropriate, shall be entered against the adverse party." Fed. R. Civ. P. 56(e).

**ANALYSIS**

Plaintiff brings this employment discrimination and retaliation action against Defendants pursuant to Title VII of the Civil Rights Act of 1964, as amended ("Title VII"), and 42 U.S.C. § 1981. In addition, Plaintiff has alleged state law claims of tortious interference with contractual relation and tortious interference with employment relations against Dawson Country Club and

Montgomery.

Defendants argue that they are entitled to summary judgment on all of Plaintiffs claims. Defendants argue they are entitled to summary judgment on Plaintiffs' retaliation claims made pursuant to § 1981, §1985 and Title VII on the merits. Dawson Country Club and Montgomery argue that Plaintiff cannot state a claim for tortious interference of contract or employment relations because Montgomery and Dawson Country Club did not interfere with Plaintiff's employment contract or business relationship with GDB. Plaintiff brings a separate motion for partial summary judgment on the Title VII and § 1981 claims as to liability.

**Retaliation**

Plaintiff complains that he was retaliated against after he complained of discrimination at the Country Club in violation of Title VII and § 1981. Both Title VII and § 1981 have the same requirements of proof and use the same analytical framework. Standard v. A.B.E.L. Services, Inc., 161 F.3d 1318, 1330 (11th Cir.1998). To establish a *prima facie* case of retaliation, a plaintiff must show that (1) he engaged in protected speech; (2) he suffered an adverse employment action; and (3) there is a causal relationship between the two events. Pennington v. City of Huntsville, 261 F.3d 1262, 1265 (11th Cir. 2001). Once Plaintiff has established a *prima facie* case, Defendants must provide a legitimate, nondiscriminatory reason for its actions. In order to prevail, the burden shifts to Plaintiff to show that the proffered nondiscriminatory reason was a mere pretext for discrimination. Silvera v. Orange County School Board, 244 F.3d 1253 (11th Cir. 2001).

The Defendants do not concede that Plaintiff has established a *prima facie* case. Defendants argue that as a matter of law, Beckham did not engage in protected speech when he criticized the Club for perceived racial discrimination. Even if true, and that fact is disputed, the Club's conduct cannot be attributed to an unlawful employment action of Defendant GBD or Wiggins. The Eleventh Circuit first addressed this issue in 1997. Little v. United Technologies, 103 F.3d 956 (11th Cir. 1997). Judge Birch stated:

> We agree with the Ninth Circuit's disposition of *Silver,* a case factually similar to the one at hand. As stated by that court,
> [b]y the terms of the statute ... not every act by an employee in opposition

> to racial discrimination is protected. The opposition must be directed at an unlawful employment practice of an employer, not an act of discrimination by a private individual.

Little, 103 F.3d at 959.

In this case, prior to discussing the letter with Wiggins, Beckham had never complained to Wiggins about any racial discrimination at the Country Club. Beckham did not object to being a member of the Club or to the Bank paying his dues at the Club. The transcript of the conversation between Wiggins and Beckham revealed that Wiggins acknowledged that there may be members of the Club or the community that might have racist attitudes, but that Beckham's blanket condemnation of the entire community as racist and backwards was over-broad. Even if Beckham's accusations were reasonable and true, as Judge Birch has pointed out Beckham's "opposition must be directed at an unlawful employment practice of an employer, not an act of discrimination by a private individual." Id.

Likewise, Plaintiff's § 1981 claim against Montgomery and the Dawson Country Club must also fail. The cases relied upon by Plaintiff from the 1980's are not applicable to the facts of this case. They stand for the proposition that if § 1981 prevents citizens from refusing to enter into contracts with African-American, then it necessarily protects non-minorities when they did enter into contracts with African-Americans. See, Gordon v. City of Cartersville, 522 F.Supp. 753 (N.D. Ga. 1981); Pinkard v. Pullman-Standard, 678 F.2d 1211 (5th Cir. Unit B, 1982). Plaintiff is not complaining that the Defendants prevented him from contracting with African-Americans or retaliated against him for doing so. Therefore, Defendants' motions for summary judgment (Docs. 26, 27) on Plaintiff's Title VII and 42 U.S.C. 1981 claims is **GRANTED.** Plaintiff's partial motion for summary judgment on the same claims (Doc. 29) is **DENIED.**

**42 U.S.C. § 1985-Conspiracy**

Plaintiff also alleges a conspiracy claim against all Defendants pursuant to 42 U.S.C. § 1985 to retaliate against him for complaining about alleged racism at the Country Club. This claim is based on the underlying Title VII and §1981 retaliation claims. A § 1985 conspiracy claim does not confer any rights upon the Plaintiff but provides an enforcement method to secure rights protected pursuant to other statutes. Great American Federal Savings & Loan Ass'n. v.

Novotny, 442 U.S. 366 (1979). In this case, the substantive § 1981 and Title VII claims fail as a matter of law, and therefore the § 1985 claim must fail. Defendants' motions for summary judgment on the § 1985 claim (Docs. 26, 27) is **GRANTED.** Plaintiff's motion for partial summary did not address the § 1985 claim.

**State Law Claims**

Plaintiff also asserts the state law claims against Dawson Country Club and Montgomery for tortious interference with contractual relations and tortious interference with employment relations. The Club and Montgomery have moved for summary judgment on these claims. Defendants assert that Plaintiff has failed to establish a *prima facie* case as to the two state law claims.

One of the primary elements of both causes of action is that the plaintiff must show that the defendant induced a third party to terminate or not to enter into an employment contract with plaintiff, to the financial detriment of the plaintiff. Lively v. McDaniel, 240 Ga. App. 132 (1999). In other words, the tortfeasor must be a "stranger" to the contract at issue. Rendon Inc. V. Liberty Real Estate Ltd., 213 Ga. App. 333, 336 (1994) ("[t]he tortfeasor must be a "stranger" to the business relationship at issue; a party, under appropriate circumstances, can be a non-signer of a particular contract and yet not be a stranger to the contract itself or to the business relationship giving rise thereto and underpinning it."). To be a "stranger" does not necessarily mean that the tortfeasor was not a party to the contract but was an individual who induced a third party not to participate in the business relationship or enter into a contract. Id.

The evidence is undisputed that Montgomery had never had an actual conversation with Beckham and was not even aware when the letter was written that Beckham managed GBD. Montgomery never had a conversation with Wiggins or gave the letter to Wiggins. The only people Montgomery shared the letter with were members of the Club Board of Directors. There is no evidence that Montgomery or the Board authorized the release of the letter, even though it is apparent that the letter was released. The person that gave Wiggins the letter was a member of the Bank's Advisory Board and obtained the letter from a Club member. Lastly, there is no evidence that anyone from the Club talked to Wiggins, much less told him to fire Beckham. Beckham has

failed to carry his burden of showing that the Club or Montgomery induced Wiggins to terminate or influence employment or business relationship with Beckham. Therefore, Defendants motion for summary on the state law claims (Doc. 27) is **GRANTED.** Plaintiff did not address the state law claims in his motion for partial summary judgment. (Doc. 29).

**CONCLUSION**

Defendants' motions for summary judgment on all of Plaintiffs' claims (Docs. 26, 27) are **GRANTED.** Accordingly, Plaintiff's motion for partial summary judgment (Doc. 29) is **DENIED.**

**SO ORDERED**, this 29th day of March, 2006.

/s/W. Louis Sands
**W. LOUIS SANDS, CHIEF JUDGE**
**UNITED STATES DISTRICT COURT**